IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Mai V.,[1]                                              No. 3:23-cv-00016-HZ

                          Plaintiff,                   OPINION & ORDER

          v.

COMMISSIONER, SOCIAL
SECURITY ADMINISTRATION,

                          Defendant.

Kevin Kerr
Kerr Robichaux & Carroll
PO Box 14490
Portland, OR 97293

          Attorney for Plaintiff

Kevin C. Danielson
United States Attorney's Office
District of Oregon
1000 SW Third Avenue, Suite 600
Portland, OR 97204

---

[1] In the interest of privacy, this Opinion uses only the first name and the initial of the last name of the non-governmental party or parties in this case. Where applicable, this Opinion uses the same designation for a non-governmental party's immediate family member.

1 – OPINION & ORDER

Zachary James Berkoff-Cane
Social Security Administration
Office of the General Counsel
6401 Security Blvd
Baltimore, MD 21235

     Attorneys for Defendant

HERNÁNDEZ, District Judge:

     Plaintiff Mai V. brings this action seeking judicial review of the Commissioner's final decision to deny disability insurance benefits ("DIB"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). The Court reverses the Commissioner's decision and remands this case for further administrative proceedings.

## PROCEDURAL BACKGROUND

     Plaintiff applied for DIB on July 10, 2020, alleging an onset date of January 1, 2018. Tr. 18.[2] She amended her alleged onset date to December 9, 2016. Tr. 18. Plaintiff's date last insured ("DLI") is September 30, 2020. Tr. 20. Her application was denied initially and on reconsideration. Tr. 18.

     On November 4, 2021, Plaintiff appeared with counsel for a hearing before an Administrative Law Judge ("ALJ"). Tr. 18. On December 28, 2021, the ALJ found Plaintiff not disabled. Tr. 29. The Appeals Council denied review. Tr. 3.

## FACTUAL BACKGROUND

     Plaintiff alleges disability based on PTSD, a traumatic brain injury, migraines, a mood disorder, depression, anxiety, high blood pressure, and insomnia. Tr. 335. On her date last

---

[2] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record, filed herein as Docket No. 8.

insured, she was 43 years old. Tr. 27. She has at least a high school education and past relevant work experience as a waitress. Tr. 27.

## SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if they are unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Disability claims are evaluated according to a five-step procedure. *See Valentine v. Comm'r*, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step procedure to determine disability). The claimant bears the ultimate burden of proving disability. *Id.*

In the first step, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b). In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the claimant is not disabled. *Id.*

In step three, the Commissioner determines whether the claimant's impairments, singly or in combination, meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. *Yuckert*, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any impairment(s), has the residual functional capacity (RFC) to perform their "past relevant work."

20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can perform past relevant work, the claimant is not disabled. If the claimant cannot perform past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work. *Yuckert*, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). If the Commissioner meets their burden and proves that the claimant can perform other work that exists in the national economy, then the claimant is not disabled. 20 C.F.R. §§ 404.1566, 416.966.

## THE ALJ'S DECISION

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity after her alleged onset date through her date last insured. Tr. 20. Next, at steps two and three, the ALJ determined that Plaintiff has the following severe impairments: "posttraumatic stress disorder (PTSD), depressive disorder, anxiety disorder, attention deficit disorder (ADD), migraine, obesity and mild degenerative joint disease of the knees." Tr. 21. However, the ALJ determined that Plaintiff's impairments did not meet or medically equal the severity of a listed impairment. Tr. 21. At step four, the ALJ concluded that Plaintiff has the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) with the following limitations:

> The claimant can occasionally use ramps or stairs but cannot use ladders, ropes or scaffolding. The claimant cannot work in environments with exposure to heavy machinery with fast-moving parts or at unprotected heights. The claimant cannot perform balancing on slippery, uneven or narrow surfaces. The claimant can understand and remember simple, routine task. The claimant can maintain attention and concentration for simple, routine task in two hours intervals. The claimant cannot have public contact. The claimant can have occasional coworker contact with no teamwork related task and the claimant can perform simple work-related decisions.

Tr. 23. Because of these limitations, the ALJ concluded that Plaintiff could not perform her past relevant work. Tr. 27. But at step five, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, such as "Garment folder," "Garment sorter," and "Bagger of small items." Tr. 28. Thus, the ALJ concluded that Plaintiff is not disabled. Tr. 29.

## STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the Commissioner's findings "are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal quotation marks omitted). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). The court considers the record as a whole, including both the evidence that supports and detracts from the Commissioner's decision. *Id.*; *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007). "Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed." *Vasquez*, 572 F.3d at 591 (internal quotation marks and brackets omitted); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's.") (internal quotation marks omitted).

## DISCUSSION

Plaintiff argues that the ALJ erred by (1) failing to consider whether her migraines medically equaled Listing 11.02, (2) failing to provide sufficient reasons to reject the medical

opinion of Dr. Nikhaliza Nikhassan ("Dr. Hassan"),[3] (3) failing to include any off-task

limitations or recognition of absences in the RFC, and (4) considering a Cooperative Disability

Investigator Unit (CDIU) report. Pl. Op. Br. 1, ECF 12. The Court concludes that the first three

assignments of error have merit, so the case must be remanded for further proceedings.

## I.    Listing 11.02

Plaintiff argues that the ALJ erred by failing to consider whether her migraines medically

equaled Listing 11.02. Pl. Op. Br. 11. At step three, the Commissioner determines whether any

of a claimant's impairments, singly or in combination, meet or equal a listed impairment. 20

C.F.R. §§ 404.1525-404.1526 & pt. 404, subpt. P, app. 1. An impairment "is medically

equivalent to a listed impairment in appendix 1 if it is at least equal in severity and duration to

the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). The claimant bears the burden to

show that she meets or equals a listing. *Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005).

Migraines may be a form of primary headache disorder. Social Security Ruling (SSR) 19-

4p, *available at* 2019 WL 4169635, at *2 (August 26, 2019). Although a primary headache

disorder is not a listed impairment, the Commissioner may find that it medically equals a listing.

*Id.* at *7. "Epilepsy (listing 11.02) is the most closely analogous listed impairment for an MDI

[medically determinable impairment] of a primary headache disorder. While uncommon, a

person with a primary headache disorder may exhibit equivalent signs and limitations to those

detailed in listing 11.02 (paragraph B or D for dyscognitive seizures)." *Id.* Paragraph B of Listing

11.02 requires "Dyscognitive seizures (see 11.00H1b), occurring at least once a week for at least

3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C)."

---

[3] Medical records list the doctor's name as "Nikhaliza Nikhassan," but the ALJ referred to the doctor as "Dr. Hassan." The Court will do the same for the sake of consistency.

Dyscognitive seizures "are characterized by alteration of consciousness without convulsions or loss of muscle control." 20 C.F.R. pt. 404, subpt. P, app. 1 rule 11.00H1b.

> To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: a detailed description from an AMS [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

SSR 19-4p, 2019 WL 4169635, at *7.

The ALJ considered other listed impairments but did not consider Listing 11.02. Tr. 21. Plaintiff argues that because she regularly suffered from migraines throughout the relevant period, and the ALJ acknowledged those migraines, the ALJ erred in failing to consider whether they medically equaled Listing 11.02. Pl. Op. Br. 12-13. She argues that the ALJ's recognition that Plaintiff reported suffering four to seven migraines per month triggered an obligation to consider the listing. *Id.* at 12 (citing Tr. 24). Defendant argues that the ALJ did not need to consider Listing 11.02 because Plaintiff did not submit evidence from an agency doctor, and that any error was harmless because the migraines were based on Plaintiff's self-reports, which the ALJ reasonably discounted. Def. Br. 3-7, ECF 16.

A.    Lack of Agency Source

Defendant first argues that Plaintiff has not shown that she meets Listing 11.02 because she has no evidence from an agency doctor supporting a finding of medical equivalence. Def. Br. 3-4. Defendant asserts that "a finding of medical equivalence requires evidence from a medical consultant, psychological consultant, medical expert, or Appeals Council medical support staff

supporting the finding." *Id.* at 3 (citing SSR 17-2p, *available at* 2017 WL 3928306, at *3 (March 27, 2017)). SSR 17-2p explains:

> At the initial and reconsideration levels of the administrative review process, Federal or State agency Medical Consultants (MC) or Psychological Consultants (PC) consider the evidence and make administrative medical findings about medical issues, including whether an individual's impairment(s) meets or medically equals a listing. MCs and PCs are highly qualified medical sources who are also experts in the evaluation of medical issues in disability claims under the Act. In most situations, we require adjudicators at the initial and reconsideration levels to obtain MC or PC administrative medical findings about medical equivalence.
>
> At the hearings level of the administrative review process, administrative law judges (ALJ) and some attorney advisors determine whether an individual's impairment(s) meets or medically equals a listing at step 3 of the sequential evaluation process. To assist in evaluating this issue, adjudicators at the hearings level may ask for and consider evidence from medical experts (ME) about the individual's impairment(s), such as the nature and severity of the impairment(s).
>
> At the AC [Appeals Council] level of the administrative review process, when the AC exercises its authority to issue a decision, it determines whether an individual's impairment(s) meets or medically equals a listing. The AC may ask its medical support staff to help decide whether an individual's impairment(s) medically equals a listing.

SSR 17-2p, 2017 WL 3928306, at *3.

Plaintiff counters that the ALJ could have properly relied on a medical opinion from her treating source. Pl. Reply 3, ECF 17. She points out that the ALJ could rely on evidence from a medical expert. *Id.* (citing SSR 17-2p). Plaintiff also notes that under the regulations, a "qualified, equipped, and willing" treating source is the preferred source for consultative examinations or tests. *Id.* (citing 20 C.F.R. § 404.1519h). The Court agrees with Plaintiff. The ALJ was responsible for determining whether Plaintiff's headaches equaled a listing. 20 C.F.R. § 404.1526(e)(2). The regulations provide that the ALJ is to consider all relevant evidence in the record in determining whether an impairment medically equals a listing. *Id.* § 404.1526(c). SSR 17-2p does not state that the evidence of a treating source is not competent evidence based on

which an ALJ could find that a claimant meets or equals a listing. And as Plaintiff argues,

reading the SSR in that way is not reasonable in light of the regulations. Pl. Reply 3. The lack of

an agency doctor's finding was not a basis to ignore the possible applicability of Listing 11.02.

Dr. Hassan's October 2021 medical opinion stated that Plaintiff had more than 15 days of

headaches per month and listed various symptoms. Tr. 1552-54. Dr. Hassan's treatment notes

were also part of the record and included descriptions of Plaintiff's headache events. *E.g.*, Tr.

1035. Given that evidence, the ALJ should have considered Listing 11.02.

      B.      Harmless Error Analysis

     Next, Defendant argues that any error was harmless because the migraines were based on

Plaintiff's self-reports, and the ALJ reasonably discounted Plaintiff's testimony. Def. Br. 4-7

(citing *Amy F. v. Comm'r, Soc. Sec. Admin.*, No. 20-cv-01838-HZ, 2022 WL 2063991, at *6 (D.

Or. June 6, 2022)). In *Amy F.*, this Court held that a failure to discuss Listing 11.02 was harmless

when the plaintiff's headache complaints were based on her self-reports and the ALJ properly

discounted those self-reports. 2022 WL 2063991, at *6.

     The ALJ is responsible for evaluating symptom testimony. SSR 16-3p, 2017 WL

5180304, at *1 (Oct. 25, 2017). The ALJ engages in a two-step analysis for subjective symptom

evaluation. *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (superseded on other

grounds). First, the ALJ determines whether there is "objective medical evidence of an

underlying impairment which could reasonably be expected to produce the pain or other

symptoms alleged." *Id.* (internal quotations omitted). Second, "if the claimant has presented such

evidence, and there is no evidence of malingering, then the ALJ must give specific, clear and

convincing reasons in order to reject the claimant's testimony about the severity of the

symptoms." *Id.* (internal quotations omitted).

When evaluating subjective symptom testimony, "[g]eneral findings are insufficient." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)). "An ALJ does not provide specific, clear, and convincing reasons for rejecting a claimant's testimony by simply reciting the medical evidence in support of his or her residual functional capacity determination." *Brown-Hunter v. Colvin*, 806 F.3d 487, 489 (9th Cir. 2015). Instead, "the ALJ must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony." *Holohan v. Massanari*, 246 F.3d 1195 (9th Cir. 2001); *see also Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discount the claimant's testimony.").

At the hearing, Plaintiff testified that her migraines "were okay, maybe a few a month" until she had a major head injury in June 2018. Tr. 50. She testified that "after that, they increased substantially and significantly, and that's when everything became very, very difficult." Tr. 50. She testified that her migraines increased in frequency from four or five per month to ten or twelve per month. Tr. 50. She testified, "the intensity of them became significantly worse as well. They started to change my vision.. . . They would leave me screaming and I never had that before. They were making me blind." Tr. 50. She needed help from family with meals and switched her schedule to sleep during the day. Tr. 50-51. She also testified that she would read, but mostly through audiobooks. Tr. 51. She testified that mold affected her migraines. Tr. 57. Plaintiff testified that before her June 2018 head injury, "basic Imitrex pills could get [the migraines] under control within a couple of hours depending on when they would hit." Tr. 57.

Plaintiff also reported the effects of her migraines to her providers. For example, in May 2019, she told her neurologist, Dr. Hassan, that her migraines caused loss of vision that could last for hours, and she would need to sit in complete darkness. Tr. 1035. They caused pain, nausea, and vomiting. Tr. 1035. Sound became amplified, and she would become convinced that she could hear a radio or TV. Tr. 1035. She would get hot and cold at the same time and her face would flush. Tr. 1035. She reported that she did not walk straight for a few days after a migraine. Tr. 1035. Plaintiff reported suffering from four to seven severe migraines per month, as well as milder migraines lasting five to six days after her period ended and mild tension headaches on other days. Tr. 1035.

The ALJ found that Plaintiff's migraines were a severe impairment. Tr. 21. The ALJ noted that Plaintiff reported to Dr. Hassan that she had "4-7 severe migraines a month and mild migraines on the other days." Tr. 24. The ALJ found Plaintiff's testimony "not entirely consistent with the evidence." Tr. 25. The ALJ discounted Plaintiff's testimony about "excruciating pain and being limited in her activities of daily living" based on her migraines. Tr. 25. The ALJ stated, "Dr. Hassan indicated the claimant was doing well after adjusting and adding the medications. Additionally, injection therapies were effective at aborting refractory headaches." Tr. 25. The ALJ relied on unremarkable objective medical findings. Tr. 25. The ALJ also discounted Plaintiff's testimony about her migraines based on her work as a yoga instructor, counselor, and photographer. Tr. 24-25. As addressed below, the ALJ found Dr. Hassan's opinion about Plaintiff's migraines not persuasive, rejecting the doctor's statement that Plaintiff had more than fifteen migraines per month because "[t]he doctor previously indicated the claimant was having 6-7 severe migraines around the time of the relevant period." Tr. 26. The

ALJ also asserted that "there were no significant findings on examinations" even when Plaintiff was complaining of current migraines. Tr. 26.

Defendant asserts that the ALJ reasonably discounted Plaintiff's testimony about her migraines based on her ability to work, improvement with treatment, and the objective medical record. Def. Br. 4-7. Plaintiff counters that while the ALJ may have discounted her testimony that she suffered more frequent migraines, the ALJ acknowledged that Plaintiff suffered from four to seven migraines per month. Pl. Reply 4 (citing Tr. 24). Plaintiff states that the ALJ relied on evidence that she had six to seven migraines per month to reject Dr. Hassan's opinion that she had more frequent migraines. *Id.* (citing Tr. 26). Plaintiff is correct. Based on an acknowledged frequency of at least four migraines per month, the ALJ should have considered Listing 11.02, which requires at least one dyscognitive seizure per week. More difficult is the question of the severity of Plaintiff's migraines. The ALJ discounted Plaintiff's testimony about the severity of her migraines. If the ALJ reasonably discounted that testimony, the error in failing to consider Listing 11.02 could still be harmless. The Court therefore assesses the bases the ALJ relied on in discounting Plaintiff's testimony about her migraines.

i.    Part-Time Work

"An ALJ may consider any work activity, including part-time work, in determining whether a claimant is disabled[.]" *Ford v. Saul*, 950 F.3d 1141, 1156 (9th Cir. 2020) (holding that ALJ reasonably discounted doctor's opinion about claimant's ability to work where the claimant testified that she could work occasional eight-hour shifts for FedEx).

In discounting Plaintiff's testimony about the severity of her migraines, the ALJ relied on Plaintiff's work as a yoga instructor and counselor to teenagers. Tr. 25 (citing Tr. 1036, 1040). The ALJ also noted that Plaintiff did photo shoots. Tr. 25 (citing Tr. 911, 1564, 1594). In

October 2018, Plaintiff told a provider that she and her then-husband owned a yoga studio and did outreach to at-risk youth. Tr. 640. Plaintiff told a provider in October 2018 that she was a yoga instructor and injured herself doing a back twist. Tr. 1040. But in May 2019, she told a physician that she had a license for a yoga school, but the school was currently not operating. Tr. 1036. She also told the provider that she worked as a suicide counselor to teenagers. Tr. 1036. In January 2020, Plaintiff told a physical therapist that she worked as a fitness instructor and adventure photographer. Tr. 911. A January 2020 treatment plan review for Plaintiff noted that she "continues to struggle with interpersonal conflict and difficulty with maintaining consistency in her occupational functioning (she is self-employed as a photographer)." Tr. 1564. The review also noted that Plaintiff was "engaging more and more in her photography, and starting to get offers for some paid shoots." Tr. 1564. In April 2020, she reported that some photos she had taken ran in a newspaper story. Tr. 1594.

Beyond the ALJ's citations to the record, Defendant points to other statements from Plaintiff to her providers showing that she continued to do photography work throughout 2020 and 2021. Def. Br. 5-6. Plaintiff characterizes her photography business as "sporadic." Pl. Reply 4. At her hearing, she testified that her photography work "was never consistent month to month." Tr. 47. She testified that her yoga teaching "significantly dwindled" beginning in 2018 and that "it was only ever one class at a time." Tr. 47. The ALJ did not ask Plaintiff about her work as a counselor.

The record shows that Plaintiff engaged in some degree of part-time work during the relevant period, which provides some support for finding that her migraines were not as debilitating as claimed. But because Plaintiff's photography and yoga teaching work was part-time self-employment, it is not analogous to regular full-time employment. In particular, as a

self-employed person, Plaintiff had control over her schedule and the amount she worked. The record does not reflect that Plaintiff worked regular hours for her photography or yoga teaching jobs. The record is insufficiently developed as to Plaintiff's counseling job. The ALJ found that Plaintiff did not engage in substantial gainful activity from her alleged onset date through her date last insured because there was no evidence that her earnings from her work as a yoga instructor or photographer during that time ever rose to the level of substantial gainful activity. Tr. 20-21. Nothing indicates that Plaintiff worked while suffering from a migraine, so her ability to do part-time, self-employed work does not undermine her testimony about the severity of her symptoms during a migraine. This is not a case like *Ford*, where the claimant could work eight-hour shifts for a company. Plaintiff's part-time work provides support for some degree of discounting her testimony about the frequency of her migraines, but it is not a basis to conclude that the ALJ did not need to consider Listing 11.02.

ii.    Improvement with Treatment

Relevant factors for the ALJ to consider when evaluating symptom testimony include "[t]he type, dosage, effectiveness, and side effects of any medication" the plaintiff takes to alleviate symptoms. 20 C.F.R. § 404.1529(c)(3)(iv). "[E]vidence of medical treatment successfully relieving symptoms can undermine a claim of disability." *Wellington v. Berryhill*, 878 F.3d 867, 876 (9th Cir. 2017). *See also Kitchen v. Kijakazi*, 82 F.4th 732, 739 (9th Cir. 2023) (holding that the ALJ reasonably discounted the claimant's symptom testimony based on "a gradual improvement in his functioning with prescribed medication and psychotherapy sessions").

The ALJ found that Plaintiff's migraines improved with treatment. Tr. 25. In May 2019, Plaintiff reported that she had been taking topiramate for the last 12 years to prevent migraines.

Tr. 1035. She reported that her symptoms had gotten worse since October 2018. Tr. 1035. She

also reported taking adabinol syrup, which would abort a headache after two hours. Tr. 1035.

She reported that sumatriptan (Imitrex) stopped being effective three months prior. Tr. 1035. In

July 2019, Plaintiff reported that she was having headaches and needed a new medication to treat

them. Tr. 1033. In October 2019, Plaintiff went to the emergency room because her migraine had

lasted for a week and had not responded to her usual treatments. Tr. 1028. She reported that she

usually had aura or phonophobia during migraines, but did not during that particular migraine.

Tr. 1032. In November 2019, Dr. Hassan reported that she had increased Plaintiff's dose of

topiramate and Plaintiff had tolerated it well. Tr. 1026. Plaintiff reported that she had a three-

month period without any migraines, but then her headaches increased in frequency. Tr. 1026.

She reported eight migraines in the past month and stated that they would usually last about two

hours. Tr. 1026. She stated that Imitrex was usually helpful, except for the abnormal migraine for

which she had to go to the emergency room. Tr. 1026. Plaintiff reported that she was given

Fioricet and that it, combined with Imitrex, was effective at aborting her headaches. Tr. 1026-27.

At a visit in March 2020, Dr. Hassan wrote that adding propranolol to Plaintiff's

medications had reduced her migraines. Tr. 1025. An injection of sumatriptan was effective at

terminating them. Tr. 1025. She was tolerating both medications well with no side effects. Tr.

1025. Plaintiff reported that she only had to use the sumatriptan injection twice in the past

several months, and it worked right away in aborting the headaches. Tr. 1025. Plaintiff's tension

headaches went away for a time, but Plaintiff again had them every day once the pandemic

began. Tr. 1025. In October 2020, Dr. Hassan reported that Plaintiff had reduced her topiramate

dose over time. Tr. 1277. She was having six to seven headaches per month since the addition of

propranolol. Tr. 1277. Fioricet normally aborted the headaches. Tr. 1277. Her headaches became

more intense when she was having heavy menses, and she would use Fioricet, sumatriptan, and sometimes cannabis to treat them. Tr. 1277.

In February 2021, Plaintiff reported a persistent headache accompanied by delusions and left-sided facial weakness. Tr. 1779. She reported that she had been headache free for a few months, but then tried to stop taking topiramate and started having headaches again. Tr. 1779. A sumatriptan injection did not stop the headache. Tr. 1779. Dr. Hassan gave her a shot of Toradol and ordered Medrol. Tr. 1778. Dr. Hassan recommended over the counter medications to try in combination with Plaintiff's prescription next time she had a severe headache. Tr. 1778. She also recommended supplements. Tr. 1778. In March 2021, Plaintiff reported an increase in headaches. Tr. 1789. She reported that the Toradol injection and Medrol were not effective. Tr. 1789. She reported that she had more than fifteen headaches per month with extreme pain and loss of vision, as well as sensitivity to light and noise. Tr. 1789. Dr. Hassan prescribed Aimovig and instructed Plaintiff to continue with her other medications. Tr. 1791.

The foregoing establishes that while medication was somewhat helpful at mitigating Plaintiff's symptoms, she continued to report migraines, and medications did not always stop them. Dr. Hassan had to regularly adjust Plaintiff's dose or change her medications. And none of the medications prevented Plaintiff from getting migraines; they only decreased the frequency and were sometimes effective at aborting the migraines. Plaintiff had some periods without headaches, but then they would return. The records reflect that with medication, Plaintiff's headaches were at one point reduced to six or seven per month, as the ALJ noted. Tr. 26. Plaintiff then reported an increase in headaches. Tr. 1789. The ALJ could reasonably interpret the medical records to discount Plaintiff's testimony that she was having ten or twelve headaches per month for the entire period after June 2018. But the records do not show a consistent

improvement in Plaintiff's condition. They reflect no period longer than a few months in which Plaintiff did not have migraines. The efficacy of Plaintiff's medications is not a basis to conclude that the ALJ did not need to consider Listing 11.02.

iii.    Objective Medical Evidence

An ALJ may discount a claimant's testimony based on a lack of support from objective medical evidence, but this may not be the sole reason. *See Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005) (holding that "an ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of pain."); *Taylor v. Berryhill*, 720 F. App'x 906, 907 (9th Cir. 2018) (explaining that a "lack of objective medical evidence cannot be the sole reason to discredit claimant's testimony," and therefore holding that the ALJ failed to provide clear and convincing reasons for discounting the claimant's testimony) (citation omitted); *Heltzel v. Comm'r of Soc. Sec. Admin.*, No. 19-1287, 2020 WL 914523, at *4 (D. Ariz. Feb. 26, 2020) (stating that "[b]ecause the ALJ's other reasons for rejecting Plaintiff's testimony were legally insufficient, a mere lack of objective support, without more, is insufficient to reject Plaintiff's testimony."). However, "[w]hen objective medical evidence in the record is *inconsistent* with the claimant's subjective testimony, the ALJ may indeed weigh it as undercutting such testimony." *Smartt v. Kijakazi*, 53 F.4th 489, 498 (9th Cir. 2022).

The ALJ found the degree of symptoms reported inconsistent with examinations finding Plaintiff to be alert, pleasant, attentive, cooperative, well-groomed, and with an adequate fund of knowledge and memory. Tr. 24, 25. These findings, which were made when Plaintiff was not suffering from a migraine, do not undercut her testimony about symptoms she suffered during a migraine. Plaintiff did not testify, for instance, that migraines affected her memory or thought

process when she was not undergoing them. And Plaintiff's demeanor, appearance, and ability to cooperate at a medical appointment when she is not undergoing a migraine say nothing about her behavior during a typical migraine because nothing in the record suggests such a connection. Furthermore, there is objective evidence in the record supporting Plaintiff's migraines, which the ALJ did not mention. A head MRI of Plaintiff done in early 2021 showed "mild nonspecific white matter changes, which is commonly seen in people who ha[ve] chronic migraines," according to Dr. Hassan. Tr. 1789. The ALJ erred in relying on the objective medical record in discounting Plaintiff's testimony about her migraines.

In sum, although the ALJ could reasonably rely on Plaintiff's work activities and the effects of medication to discount some of her more extreme testimony at her hearing about her migraines, that evidence does not undermine much of Plaintiff's testimony about the symptoms of her migraines, such as the need to lie down in a dark room. And the ALJ credited Plaintiff's report to her doctor that she had between four and seven migraines per month. The case must be remanded for the ALJ to consider whether Plaintiff's migraines medically equal Listing 11.02.

## II.    Medical Opinion Evidence

Plaintiff argues that the ALJ erroneously rejected Dr. Hassan's opinion. Pl. Op. Br. 13. For claims filed on or after March 27, 2017, ALJs are no longer required to give deference to any medical opinion, including treating source opinions. Rules Regarding the Evaluation of Medical Evidence, 2017 WL 168819, 82 Fed. Reg. 5844-01 (Jan. 18, 2017); 20 C.F.R. §§ 404.1520c, 416.920c. Instead, the agency considers several factors. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). These are: supportability, consistency, relationship to the claimant, specialization, and "other factors." 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5). The "most important" factors in

the evaluation process are supportability and consistency. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

Under this framework, the ALJ must "articulate . . . how persuasive [they] find all of the medical opinions" from each doctor or other source. 20 C.F.R. §§ 404.1520c(b), 416.920c(b)(2). In doing so, the ALJ is required to explain how supportability and consistency were considered and may explain how the other factors were considered. 20 C.F.R §§ 404.1520c(b)(2), 416.920c(b)(2). When two or more medical opinions or prior administrative findings "about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same," the ALJ is required to explain how the other factors were considered. 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3). "Even under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence." *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

In October 2021, Dr. Hassan gave an opinion about Plaintiff's ability to work based on the effects of her migraines. Tr. 1552-54. Dr. Hassan wrote that the migraines began "many years ago" and that they caused "severe sharp pain diffusely w/ light sensitivity, vision loss." Tr. 1552. Dr. Hassan wrote that the frequency of Plaintiff's headaches fluctuated but that they typically occurred more than 15 days per month. Tr. 1552. They could last "hours to [a] whole day." Tr. 1553. Plaintiff's symptoms during a headache included pulsating or throbbing head pain, pain on both sides of the head, nausea, sensitivity to light and sound, changes in vision, sensory changes, and weakness of one side of her face on rare occasions. Tr. 1553.

Based on these headaches, Dr. Hassan opined that Plaintiff could occasionally be exposed to bright lights, computer screens, moderate noise, proximity to moving mechanical parts, and

odors or fumes. Tr. 1553. She opined that Plaintiff had visual limitations and could occasionally have exposure to near acuity, far acuity, depth perception, accommodation, field of vision, and bright light. Tr. 1553. Dr. Hassan wrote that when Plaintiff has headaches "she prefers to lie still in a dark room." Tr. 1553. Dr. Hassan expected Plaintiff to miss sixteen or more hours of work per month due to her symptoms. Tr. 1553. The limitations began on or before December 9, 2016. Tr. 1554.

The ALJ found Dr. Hassan's opinion not persuasive. Tr. 26. The ALJ stated that the frequency of headaches listed in the opinion was not supported by or consistent with the evidence. Tr. 26. The ALJ wrote that Dr. Hassan's "examinations were rather unremarkable." Tr. 26. The ALJ also wrote that "even when the claimant was complaining of a current migraine[], there were no significant findings on examinations." Tr. 26.

Plaintiff argues that the ALJ erred in stating that the frequency of headaches specified was unsupported by or inconsistent with the evidence. Pl. Op. Br. 14. Plaintiff first points out that both she and Dr. Hassan distinguished between tension headaches and more severe migraines. *Id.* In her initial consultation with Dr. Hassan, Plaintiff described severe migraines four to seven times per month, milder migraines after her period ended, and tension headaches on other days. Tr. 922. While Plaintiff is correct that Dr. Hassan's treatment notes at times make this distinction, Defendant correctly states that Dr. Hassan's formal opinion did not. Def. Br. 9.

The ALJ reasonably concluded that Dr. Hassan's treatment notes did not support her opinion that Plaintiff had over 15 headache days per month during the relevant period. In May 2019, Plaintiff reported four to seven severe migraines per month, milder migraines after her period ended that lasted five to six days, and a mild tension headache on other days. Tr. 1035. In November 2019, Plaintiff reported that she had eight migraines in the past month. Tr. 1026. In

March 2020, Plaintiff reported that her migraines had "reduced significantly." Tr. 1025. In October 2020, she reported headaches about six to seven times per month. Tr. 1277. In March 2021, about six months after her date last insured, she reported more than fifteen headache days per month. Tr. 1789. Thus, while Dr. Hassan's opinion was consistent with her most recent treatment note, substantial evidence supports the ALJ's rejection of Dr. Hassan's opinion about the frequency of headaches during the relevant period because it was inconsistent with Dr. Hassan's treatment notes for the relevant period.

Plaintiff argues that the ALJ erred in relying on evidence of later improvement in her migraines. Pl. Op. Br. 15. Defendant counters that Plaintiff herself testified that her migraines "were okay" until her major head injury in June 2018 and that she did not begin treatment with Dr. Hassan until May 2019, at which point she began to show improvement. Def. Br. 9-10 (citing Tr. 50, 922, 1026). Plaintiff testified at the hearing that she had "maybe a few [migraines] a month" until her June 2018 head injury. Tr. 50. Based on Plaintiff's own testimony, the ALJ reasonably discounted Dr. Hassan's opinion to the extent it addressed the period before June 2018. It was also reasonable for the ALJ to discount Dr. Hassan's opinion about the frequency of migraines where it conflicted with the treatment notes during the relevant period. In sum, the ALJ did not err in rejecting Dr. Hassan's opinion about the frequency of Plaintiff's headaches.

However, the ALJ did not give a valid basis to discount Dr. Hassan's opinion about the severity of Plaintiff's headaches. The ALJ erred in rejecting Dr. Hassan's opinion because the doctor's findings were "rather unremarkable." Plaintiff correctly points out that "[t]he ALJ did not provide any clear explanation in the decision as to what findings she believed were missing from Dr. Hassan's treatment records." Pl. Op. Br. 16. As discussed above, unremarkable findings related to Plaintiff's grooming, demeanor, and memory are irrelevant to her migraine diagnosis.

Further, a head MRI showed results consistent with frequent migraines. Tr. 1789. The treatment notes showed that Dr. Hassan frequently adjusted Plaintiff's medications to respond to her ongoing symptoms.

Finally, the ALJ erred in rejecting Dr. Hassan's opinion based on a lack of significant findings during one of Plaintiff's migraines. In October 2019, Plaintiff went to the emergency room during a migraine. Tr. 1028. She described severe pain. Tr. 1029. The attending providers reported that Plaintiff "states that her migraine is different than normal due to the lack of photophobia, aura, and sensitivity to sounds. She also states that the location of her migraine is different than previous." Tr. 1029. A review of Plaintiff's systems showed that she was positive for fatigue, negative for sensitivity to sounds, positive for photophobia, negative for eye pain and visual disturbance, and negative for dizziness, light-headedness, numbness, speech difficulty, and confusion. Tr. 1030. Plaintiff was oriented to person, place, and time and had a normal mood and affect. Tr. 1031. Plaintiff had "a benign neurological examination" in a dark room. Tr. 1032. She was diagnosed with an intractable episodic headache, unspecified headache type. Tr. 1033. She was prescribed Fioricet and instructed to continue her other medications. Tr. 1030.

The notes from Plaintiff's emergency room visit show that she did have symptoms and that responding providers credited those symptoms, entered a diagnosis, and prescribed medication. Upon review, Plaintiff was found to be positive for photophobia and was examined in a darkened room. Consistent with this, Dr. Hassan indicated in her opinion that Plaintiff's symptoms of migraine included sensitivity to light. Tr. 1553. As for the unremarkable findings related to orientation, mood, and speech, Dr. Hassan's opinion did not indicate that Plaintiff suffered from mood changes, lack of orientation, or speech difficulty during a migraine. *See* Tr. 1552-54. An absence of those symptoms is not a valid basis to discount Dr. Hassan's opinion

about the severity of Plaintiff's migraines. In sum, the ALJ erred in discounting Dr. Hassan's opinion about the severity of Plaintiff's migraines.

## III.    RFC Assessment

Plaintiff argues that the ALJ failed to include all functional limitations in the RFC. Pl. Op. Br. 17. The RFC is the most a person can do, despite his or her physical or mental impairments. 20 C.F.R. § 404.1545(a). In formulating an RFC, the ALJ must consider all medically determinable impairments, including those that are not "severe," and evaluate "all of the relevant medical and other evidence," including the claimant's testimony. *Id.*; SSR 96-8p, *available at* 1996 WL 374184. In determining a claimant's RFC, the ALJ is responsible for resolving conflicts in the medical testimony and translating the claimant's impairments into concrete functional limitations in the RFC. *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008). Only limitations supported by substantial evidence must be incorporated into the RFC and, by extension, the dispositive hypothetical question posed to the VE. *Osenbrock v. Apfel*, 240 F.3d 1157, 1163-65 (9th Cir. 2001). An "RFC that fails to take into account a claimant's limitations is defective." *Valentine*, 574 F.3d at 690.

Plaintiff correctly asserts that the case should be remanded for the ALJ to consider the effect of her migraines on her ability to work. Pl. Op. Br. 18-19. As discussed above, the ALJ erred in rejecting Plaintiff's testimony about her migraines and in rejecting Dr. Hassan's opinion about the severity of the migraines.[4] Those issues bear directly on the RFC. In particular, the ALJ should consider whether the RFC needs to include an off-task or attendance limitation in

---

[4] Defendant argues that Plaintiff waived a challenge to the ALJ's assessment of her symptom testimony by failing to raise the issue in her opening brief. Def. Br. 11-12. The Commissioner relied on the ALJ's assessment of Plaintiff's testimony in arguing that the ALJ did not need to consider Listing 11.02, thereby raising the issue with the Court.

light of the frequency and severity of the migraines. Even if Plaintiff's migraines were not as severe or frequent as she claimed at the hearing or as reflected in Dr. Hassan's opinion, the ALJ appeared to credit Plaintiff's report to Dr. Hassan that she had between four and seven migraines per month. The ALJ did not include any off-task or attendance limitations in the RFC based on that report. On remand, the ALJ should more fully assess the frequency and severity of Plaintiff's migraines and consider such limitations.

## IV.    Consideration of CDIU Report

Finally, Plaintiff argues that the ALJ erred by considering a CDIU report issued before her alleged onset date. Pl. Op. Br. 19. The Seattle office of the CDIU investigated Plaintiff's prior application for disability benefits and issued a report dated September 22, 2014. Tr. 420-437. At the hearing, Plaintiff's counsel objected to the report as irrelevant and outside the period of alleged disability. Tr. 42. The ALJ agreed that the report predated the alleged onset date by two years. Tr. 42. She stated, "I think that actually we go to the weight that I give it rather than it's [sic] admissibility, but I will note your objection for the record." Tr. 42. The ALJ admitted the report as Exhibit 1F, noting counsel's objection. Tr. 42. Later in the hearing, however, the ALJ stated, "on further consideration, I'm going to look in to having 1F removed. There was an error that happened before the hearing unfortunately in this case where the exhibits were marked prior to the hearing. So, I'm going to look at having that exhibit redacted from the record and will not consider it in my decision." Tr. 48. However, in her written decision, the ALJ stated that she considered the CDIU report. Tr. 26. She wrote that she considered the report "[s]pecifically, as it relates to [Plaintiff's] past relevant work but not as to prior allegations/findings." Tr. 26. The ALJ categorized the report as a third-party statement. Tr. 26.

Plaintiff argues that the ALJ considered the report for purposes other than Plaintiff's past relevant work. Pl. Op. Br. 19. She points out several factors in support of this assertion. First, the ALJ addressed the report in the section of her decision addressing Plaintiff's RFC, not the section addressing her past relevant work. *Id.* Second, the ALJ addressed the report immediately after the paragraph concluding that Plaintiff's statements were "not entirely consistent" with the medical evidence and other evidence in the record. *Id.* at 19-20 (quoting Tr. 25-26). Third, the ALJ's step four finding only referenced Plaintiff's past relevant work as a waitress, which occurred before the CDIU investigation. *Id.* at 20.

Defendant responds that the ALJ properly relied on the report for the limited purpose of establishing Plaintiff's past relevant work. Def. Br. 12. Noting that the step four ruling favored Plaintiff, Defendant argues that any error was harmless. *Id.* at 13 (citing *Molina*, 674 F.3d at 1116). Defendant also asserts that the ALJ's reasoning in rejecting Plaintiff's symptom testimony relied entirely on evidence from the relevant period. *Id.* (citing Tr. 24-25).

The Court concludes that any error was harmless. Plaintiff asks the Court to disregard the ALJ's statement about the purpose for which the report was considered and to infer prejudicial reliance on it from the location of the discussion in the ALJ's opinion. Plaintiff points to nothing other than the position of the paragraph discussing the report from which this Court can infer that the ALJ relied on the CDIU report in discounting her testimony. That is not enough to show that the ALJ considered the report for anything besides Plaintiff's past relevant work. The ALJ found that Plaintiff could not perform her past relevant work. Tr. 27. Thus, even if the ALJ erred by not adhering to her oral ruling that the report would not be considered at all, the error was harmless. However, because the ALJ harmfully erred in other respects, this case must be remanded for further proceedings.

**CONCLUSION**

Based on the foregoing, the Commissioner's decision is REVERSED and REMANDED

for administrative proceedings.

IT IS SO ORDERED.

DATED:_____December 30, 2023.

_____
MARCO A. HERNÁNDEZ
United States District Judge